UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 MAR 17 PM 2: 14
U.S. DISTRICT COURT
N.D. OF ALABAMA

SHANNON M. ABEL and )
BRADLEY S. PHILLIPS, )
individually, and on behalf of all )
those similarly situated, )
)
Plaintiffs, )
)
vs. ) Civil Action No. CV-02-S-3034-S
) ENTERED
KEY BANK USA, N.A., )
)
Defendant. )

## MEMORANDUM OPINION

This action is before the court on the motion of defendant, Key Bank USA, N.A., to dismiss or, in the alternative, to transfer the case to the United States District Court for the Northern District of Ohio.[1] Upon consideration of the pleadings and briefs,[2] the court concludes the alternative aspect of defendant's motion is due to be granted.

### I. FACTUAL SUMMARY

This action was commenced by two plaintiffs, Shannon M. Abel and Bradley S. Phillips, who registered to attend vocational-training classes to be conducted in Birmingham, Alabama, by a now bankrupt entity known as "Solid Computer Decisions, Inc." ("SCD"). SCD described itself as "A Nonpublic Career Education School Providing Computer Technical Training."[3] The allegations of plaintiffs' complaint do not paint a pretty picture.

---

[1] *See* doc. no. 3 ("Motion to Dismiss and Enforce Forum Selection Clause, or, in the Alternative, Motion to Transfer to the United States District Court, Northern Division of Ohio, Eastern Division," filed Jan. 6, 2003).

[2] *See* doc. no. 9 (plaintiffs' response and memorandum of law), doc. no. 11 (defendant's reply), doc. no. 12 (plaintiffs' "surreply"), and doc. no. 13 (defendant's response to plaintiffs' surreply).

[3] *See* Complaint (doc. no. 1), Exhibit 1 (copy of "Student Enrollment Agreement/Contract" executed by plaintiff Shannon M. Abel), at unnumbered page 1.

For example, Shannon M. Abel registered for SCD's so-called "A+/MCSE Track,"[4] a course of instruction allegedly leading to the award of "A+ and Microsoft Certified Systems Engineer Certifications."[5] Ms. Abel allegedly was "guaranteed" that such certifications would reap great economic rewards:

> 1. During the week of February 25, 2002, I met with Solid Computer Decisions' ("SCD") student coordinator in Birmingham, Alabama, Hayne Reid ("Reid"), to discuss taking classes at SCD's training facilities in Birmingham.
>
> 2. At that meeting, Reid promised me that I would receive training classes, books, and test vouchers to obtain A+ and Microsoft Certified Systems Engineer Certifications. After completing that training, Reid also promised that I would receive full time employment with SCD with a guaranteed annual salary of $30,000.00 to $50,000.00[,] depending on which certification I chose.
>
> 3. In addition, Reid promised that if SCD could not employ me itself, SCD guaranteed placement with an outside employer at a minimum of $30,000.00 per year salary. I would also receive further training free with SCD if I chose to pursue an additional certification, as long as I was a full time employee.[6]

Viewed objectively, the representations of SCD's "student coordinator" seem far too good to have been true. Despite that, Ms. Abel signed an enrollment form on or about February 28, 2002, for a year long course of study scheduled to begin on March 4, 2002.[7] The cost of instruction was substantial: $11,000. Even so, SCD assisted Ms. Abel in obtaining a loan, as she explained in her affidavit:

> 3.[*sic*] On February 28, 2002, I returned to SCD's offices in Birmingham and enrolled in training classes, completing an application for credit in the amount of $11,000.00 *from the Sallie Mae Foundation*. Upon completing the application, Reid informed me that she would contact me to tell me whether I qualified for the loan

---

[4] *See id.*, Ex. 1 (copy of "Student Enrollment Agreement/Contract" executed by plaintiff Shannon M. Abel), at unnumbered page 4.

[5] *See* doc. no. 12 (plaintiffs' surreply), Ex. 1 (Affidavit of Shannon M. Abel), ¶ 2.

[6] *Id.* ¶¶ 1-3.

[7] *See* Complaint., Ex. 1 (copy of "Student Enrollment Agreement/Contract" executed by plaintiff Shannon M. Abel), at unnumbered page 2.

amount *from Sallie Mae.*

4. On March 1, 2002, Reid contacted me and told me *she had sent my application for credit referenced in Paragraph No. 4 above* [sic] *to Key Bank and that Key Bank approved me for the full amount of $11,000.00 to enroll in SCD's classes.* I picked up the necessary documents from Reid that day to complete and return to her on March 4, 2002.

5. Thereafter, on March 4, 2002, I returned to SCD's offices in Birmingham and gave Reid the completed documents, including SCD's Student Enrollment Contract and Key Bank's promissory note, all dated March 3, 2002. The Student Enrollment Contract is attached as **Exhibit No. 1** to the Class Action Complaint dated December 11, 2002 in this matter. The Key Bank promissory note is attached as **Exhibit No. 1-A** to the Class Action Complaint dated December 11, 2002 in this matter.[8]

The Student Enrollment Contract provided to Ms. Abel by SCD represented that her cost for financing the amount of $11,000 ("The dollar amount of credit provided to you or on your behalf") was $9,199.60 ("Finance Charge"), computed at a stated annual percentage rate of 7.80 percent, and payable at the rate of $112.22 a month over a period of 180 months, beginning on April 1, 2003.[9] The "Total Payment" (*i.e.*, "The amount you will have paid after you have made all payments as scheduled.") was stated to be $20,199.60 ($11,000 + $9,199.60).[10]

The "Federal Truth in Lending Disclosure Statement" and accompanying promissory note prepared by Key Bank, however, indicated by means of a finely-printed footnote-symbol ["(e)"] that *all* of the foregoing figures in SCD's Student Enrollment Contract merely were "an estimate." Indeed, the stated annual percentage rate of 7.80 percent was not fixed, but a "Variable Rate" indexed to the "London Interbank offered Rates" which was subject to change at the end of each

---

[8] Doc. no. 12 (plaintiffs' surreply), Ex. 1 (Affidavit of Shannon M. Abel) ¶¶ 3-5 [sic] (boldface emphasis in original; italicized emphasis added).

[9] *See* Complaint, Ex. 1, at unnumbered page 4. (The ironic significance of the April 1st date, regardless of whether it was intended, should not be lost on the reader.)

[10] *Id.*

calendar quarter. Further, Key Bank added a five percent loan origination fee ($550) to the $11,000 amount borrowed by Ms. Abel, and then applied the variable interest rate to the aggregate amount of $11,550, described as the "Total Amount of Loan." Key Bank's "Federal Truth in Lending Disclosure Statement" read, in part, as follows:

> **VARIABLE RATE**: Your interest rate is based on a "Current Index" plus a "Margin." The interest rate on your loan may increase or decrease and will be adjusted quarterly on the 1st day of each January, April, July and October (the "Change Date") if the Current Index changes. *The "Current Index" is* [the] *London Interbank offered Rates* ("LIBOR") published in the "Money Rates" section of the Wall Street Journal on the 20th day of the month preceding the "Change Date" (*e.g.*, December, March, June, and September). *The Margin added to the Current Index for your loan is 5.25%.*
>
> *Increases in the interest rate will increase the number of monthly payments you must make. In addition*, if the amount of your monthly payment is not enough to pay your loan in full by the originally scheduled maturity date plus sixty (60) months, *then the amount of your monthly payment will increase.* For example, if the loan is for $10,000.00 with a monthly payment of $107.32 for 180 months at an initial interest rate of 9.13% and the interest rate increased to 10.13% on the first Change Date, you would have to make 27 additional payments of $107.32 and a final payment of $54.04.
>
> Your loan fee for this loan is 5.00% of the amount disbursed to you or on your behalf.
>
> Late Charge: If a payment is more than 15 days late, you will be charged the lesser of $5 or 5% of the unpaid amount of the payment.
>
> Prepayment: If you pay off your loan early, you will not be entitled to a refund of any part of the Loan Fee. If you pay off early, you will not have to pay a penalty.
>
> See your contract documents for any additional information about the loan fee, default and prepayment.
> *(e) means an estimate [11]

The SCD Student Enrollment Contract signed by plaintiff Bradley S. Phillips differed from Ms. Abel's only in these respects: the date of execution (December 14, 2001); the stated annual percentage rate (8.70%); the amount of the finance charge ($10,432.60); the amount of each of 180 monthly payments ($119.07); the date on which the first monthly payment was due (January 1,

---

[11] *Id.*, Ex. 1-A at unnumbered page 1 (Key Bank's Federal Truth in Lending Disclosure Statement) (emphasis added) (the font size of the quotation preceding this marginal note is the same as the original).

2003); and the "Total Payment" ($21,432.60).[12] Again, however, Key Bank's Federal Truth in Lending Disclosure Statement and accompanying promissory note reflected, by means of the same finely-printed footnote-symbol ["⁽ᵉ⁾"], that all of the foregoing figures merely were "estimate[s]," because they were based upon a total loan amount of $11,550 (including the five percent, $550 loan origination fee), to which a "Variable Rate" indexed to the "London Interbank offered Rates" was applied at the end of each calendar quarter.

Approximately one month after plaintiffs executed the foregoing agreements and embarked upon what were supposed to have been year-long courses of instruction, SCD closed the doors of its Birmingham training facility[13] and filed for bankruptcy protection in North Carolina.[14] Key Bank refused to discharge plaintiffs from their payment obligations. Plaintiffs then commenced this action, not simply for the purpose of addressing their respective, individual liabilities to Key Bank, but also on behalf of a putative class of "all similarly situated persons who have received a student loan through Key Bank to pay for courses from SCD in the State of Alabama."[15]

Plaintiffs allege that Key Bank's loan documents violate the federal Truth in Lending Act, see 15 U.S.C. § 1601 et seq., and its implementing Regulation Z, 12 C.F.R. § 226. They premise the jurisdiction of this court upon "15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337."[16] Plaintiffs

---

[12] Id., Ex. 2 (copy of "Student Enrollment Agreement/Contract" executed by plaintiff Bradley S. Phillips), at unnumbered page 4. In addition to the differences described above, the course of instruction for which Phillips enrolled was described as the "A+/CIW and ORACLE Tracks," and it was scheduled to begin on January 21, 2002. No ending date was specified in the enrollment agreement.

[13] Complaint ¶ 12.

[14] See doc. no. 9 (plaintiffs' response to defendant's motion to dismiss or transfer), at 1.

[15] Complaint ¶ 35, at 6.

[16] Complaint ¶ 1. The first statute cited by plaintiffs, 15 U.S.C. § 1640(e), is the jurisdictional provision for actions under the Truth in Lending Act. It provides, in pertinent part, that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. . . ." The second statute cited, 28 U.S.C. § 1331, is the general federal question jurisdictional provision, providing that "[t]he district courts shall have original jurisdiction of all civil actions arising

also assert supplemental state law claims for unjust enrichment and restitution. *See* 28 U.S.C. § 1367(a).

## II. DISCUSSION

The promissory notes prepared by defendant and signed by both plaintiffs contain the following acknowledgment:

> I understand that you are located in Ohio *and this Promissory Note will be entered into in Ohio*. CONSEQUENTLY, THE PROVISIONS OF THIS PROMISSORY NOTE WILL BE GOVERNED BY FEDERAL LAWS AND THE LAWS OF THE STATE OF OHIO WITHOUT REGARD TO CONFLICT OF LAW RULES. *I agree that any suit I bring against you* (or against any subsequent holder of this Promissory Note) *must be brought in a court of competent jurisdiction in the county in which you maintain your* (or the county in which the subsequent holder maintains its) *principal place of business*.[17]

Plaintiffs argue that the foregoing clause either is unenforceable, or that it should not be enforced.

### A. Defendant's Failure to Qualify to Conduct Business in Alabama

Plaintiffs' initial argument is that defendant's promissory note — and, thus, the forum-selection clause contained within it — are "void and unenforceable as a matter of law" because Key Bank "never obtained a certificate of authority to do business in the State of Alabama."[18] Their argument relies upon an Alabama statute providing that:

> (a) A foreign corporation transacting business in this state without a certificate of authority or without complying with Chapter 14A of Title 40[19] *may not maintain a proceeding in this state* without a certificate of authority. *All contracts or agreements made or entered into in this state by foreign corporations* prior to obtaining a certificate of authority to transact business in this state shall be held void

---

under the Constitution, laws, or treaties of the United States." The final statute cited by plaintiffs pertains to Acts of Congress regulating commerce, or protecting trade and commerce against restraints and monopolies.

[17] *See* Complaint, Exs. 1-A and 2-A (Promissory Note ¶ R(2)), at numbered page 3 (capitals in original) (italics added).

[18] Doc. no. 9 (plaintiffs' brief in opposition), at 2.

[19] Chapter 14A of Title 40 is the so-called "Alabama Business Privilege and Corporate Shares Tax Act of 1999." *See* Ala. Code § 40-14A-21 (1975) (Supp. 2002).

*at the action of the foreign corporation* or by any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity.

Ala. Code § 10-2B-15.02(a) (1975) (Supp. 2002) (emphasis supplied);[20] *see also* Ala. Const. art. XII, § 232 (1901).[21]

For each of the reasons discussed below, plaintiffs' argument has no merit.

To begin with, it should be observed that Alabama Code § 10-2B-15.02(a) applies only: (1) to "contracts or agreements made or entered into *in this state*"; and (2) in suits *instituted by the non-qualifying corporation* ("at the action of the foreign corporation"). Ala. Code § 10-2B-15.02(a) (1975) (Supp. 2002) (emphasis supplied). Neither is the case here. Although plaintiffs signed their promissory notes in Alabama, they were "entered into in Ohio" — they became valid and binding only when transmitted to, and accepted by, Key Bank at its principal office and place of business in Cleveland, Ohio. *See Thorner v. Selective Cam Transmission Co.*, 4 Cal. Rptr. 409, 411, 180 Cal. App. 2d 89, 91 (Dist. Ct. App. 1960) (holding that a non-qualifying foreign corporation was not transacting business within the State of California, in the sense meant by that state's qualification

---

[20] *See also S & H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1510 (11th Cir. 1990) ("Alabama courts will not enforce a foreign corporation's contract if (1) at the time the contract was entered into, the foreign corporation had not been qualified by the secretary of state to do business in Alabama, and (2) the foreign corporation was doing business of an *intrastate* nature in Alabama pursuant to the contract.") (emphasis supplied) (citing *Sanwa Business Credit Corp. v. G.B. "Boots" Smith Corp.*, 548 So. 2d 1336, 1337 (Ala. 1989)); *Hays Corp. v. Bunge Corp.*, 777 So. 2d 62, 64 (Ala. 2000) (holding that § 10-2B-15.02(a) "bars a foreign corporation not qualified to do business in Alabama from enforcing in an Alabama court a contract it made in Alabama"); *Sanjay, Inc. v. Duncan Construction Co.*, 445 So. 2d 876, 880 (Ala. 1983) ("The law of this state is that a foreign corporation which has not qualified to do business in Alabama at the time of the contract cannot use Alabama courts to enforce that contract.").

[21] The cited portion of Alabama's Constitution provides, in part, that:

> No foreign corporation shall do any business in this state without having at least one known place of business and an authorized agent or agents therein, and without filing with the secretary of state a certified copy of its articles of incorporation or association. . . . The legislature shall, by general law, provide for the payment to the State of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state. . . .

ALA. CONST. art. XII, § 232 (1901).

statute, when extending a loan to a California resident "where the final acceptance of the offer which results from its negotiations is made by the foreign corporation at its office outside of the State of California"); *see also Ex Parte AmSouth Bank, N.A.*, 675 So. 2d 1305, 1308 n.1 (Ala. 1996) ("For purposes of jurisdiction and venue, a cause of action for default on a note arises in the forum *in which the payment is due*.") (emphasis in original); *Lee v. Great Northern Nekoosa Corp.*, 465 F.2d 1132, 1135 (5th Cir. 1972) ("These [Alabama qualification] statutes have no extraterritorial operation. Contracts made outside of Alabama are valid when made. The making of such contracts outside the State does not constitute doing business in the State."); *Leverett v. Garland Co.*, 206 Ala. 556, 90 So. 343, 344 (1921) ("The debt may have been contracted outside of Alabama, or the debt may be the result of an interstate transaction; on such matters the [Alabama] statute and Constitution have no application."); *Citizens' National Bank v. Bucheit*, 14 Ala. App. 511, 71 So. 82, 86 (1916) ("It is manifest that these regulations have no extraterritorial operation, and contracts made outside of this state, although they are to be performed in the state, are not within their influence so as to render them absolutely void in the making."). And, of course, it is plaintiffs who instituted this action, not Key Bank.

Secondly, another statutory provision exempts "corporations organized under the laws of the United States" from the requirements of Alabama Code § 10-2B-15.02(a): *i.e.*,

> (a) A foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State.
>
> (b) Except as provided in Division D, *the provisions of this article do not apply to corporations organized under the laws of the United States.*

Ala. Code § 10-2B-15.01 (1975) (1999 Replacement Vol.) (emphasis supplied).[22] Key Bank USA, N.A., is a national banking association organized under the provisions of the National Bank Act, 12 U.S.C. § 21 *et seq.*, and its activities are regulated by the Comptroller of the Currency, the Federal Reserve Board, and federal law.[23] It follows, therefore, that Alabama Code § 10-2B-15.02(a) has no application to its promissory notes. *Cf. Jeffreys v. Federal Land Bank of New Orleans*, 238 Ala. 97, 189 So. 557, 558 (1939) (holding that a Federal Land Bank is "organized under the laws of the United States" and, accordingly, was "exempt[] from the influence of" the statutory predecessor of Ala. Code § 10-2B-15.02(a)).

Thirdly, the defense created by the Alabama qualification statute is available in a federal court only when jurisdiction is founded upon the parties' diversity of citizenship and the requisite

---

[22] "Division D," which is referenced in § 10-2B-15.01(b) above, consists of six sections: § 10-2B-15.40 through § 10-2B-15.45. Section 10-2B-15.40 provides that :

> The term "foreign corporation," as used in this division shall mean:
> (1) Any bank or other corporation now or hereafter organized or existing under the laws of any state of the United States other than the State of Alabama; and
> (2) *Any national banking association or other corporation organized under the laws of the United States having its principal place of business in any state of the United States other than Alabama.*

Ala. Code § 10-2B-15.40 (emphasis supplied). Further, § 10-2B-15.41(b) specifically provides that:

> (b) Nothing contained in this division shall be construed to prohibit or make unlawful any activity in this state by a bank or other corporation which is not incorporated under the laws of this state, *or, if a national bank* or other corporation *organized under the laws of the United States*, which does not have its principal place of business in this state[,] which would be lawful in the absence of this division.

Ala. Code § 10-2B-15.41(b) (emphasis supplied). National banks, such as defendant, are required only to file a verified statement complying with the requirements specified in Alabama Code § 10-2B-15.42 with the Alabama Commissioner of Revenue.

[23] *See, e.g.*,BLACK'S LAW DICTIONARY 140 (7th ed. 1999) (defining a "national bank" as one which is "incorporated under federal law and governed by a charter approved by the Comptroller of the Currency. A national bank is permitted to use the abbreviation n.a. (national association) as part of its name."

amount in controversy,[24] and the law of the forum state is deemed by the *Erie* doctrine[25] to supply the substantive rules of decision. *See, e.g., SAR Manufacturing Co., Inc. v. Dumas Brothers Manufacturing Co., Inc.*, 526 F.2d 1283, 1285 n.4 (5th Cir. 1976) (collecting cases and observing, when considering the statutory predecessors of the present Alabama qualification statutes, that "the defense created by these statutes is available to defendants in diversity cases in federal court");[26] *Hughes Associates, Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 858 (N.D. Ala. 1986) (observing that Alabama qualification statute prevents a non-qualifying foreign corporation from enforcing a contract in state courts, and that "[t]his doctrine is also applicable in diversity cases in federal court") (citations omitted). The jurisdiction of this action is *not* based upon the parties' diversity of citizenship, however, but expressly upon "15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337."[27] Consequently, Alabama Code § 10-2B-15.02(a) has no application. *See In re: Leeds Homes, Inc.* 222 F. Supp. 20, 26-29 (E.D. Tenn. 1963) (holding that the claim of a non-qualifying corporate-creditor was not barred by the Tennessee qualification statute when federal court jurisdiction was based on the Bankruptcy Act), *aff'd sub nom. Leeds Homes Inc. v. National Acceptance Company of America*, 332 F.2d 648, 650 (6th Cir. 1964) ("[J]urisdiction in the instance case is based on federal bankruptcy law and not on diversity of citizenship. Thus a bankruptcy court does not sit 'as if it were only another state court,' and *Erie* does not apply.") (citation omitted).

Finally, as the Supreme Court of Alabama has recognized, there is an "interstate commerce exception to the requirement that out-of-state corporations must qualify in order to avail themselves

---

[24] *See* 28 U.S.C. § 1332(a)(1).

[25] *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982).

[26] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[27] Complaint ¶ 1; *see also supra* note 16.

of the state courts in the enforcement of contracts." *North Alabama Marine, Inc. v. Sea Ray Boats, Inc.*, 533 So. 2d 598, 600 (Ala. 1988).

> These laws apply . . . only when the business conducted in this state by the non-qualified corporation is intrastate in nature. *Wallace Construction Co. v. Industrial Boiler Co.*, 470 So. 2d 1151 (Ala. 1985); *Johnson v. MPL Leasing Corp.*, 441 So. 2d 904 (Ala. 1983). A non-qualified foreign corporation is not barred from enforcing its contracts in Alabama when its activities within this state are incidental to the transaction of interstate business. *Wallace*; *Johnson, supra*. Under the Constitution of the United States, a state cannot prohibit foreign corporations from conducting interstate business within its borders. *Kentucky Galvanizing Co. v. Continental Casualty Co.*, 335 So. 2d 649 (Ala. 1976); Article I, § 8, cl. 3, United States Constitution.

*North Alabama Marine*, 533 So. 2d at 600-01; *see also, e.g., WMX Technologies, Inc. v. Jackson*, 168 F.R.D. 64, 69 (M.D. Ala. 1996) (a diversity action holding that "the Alabama statutes regarding qualifying to do business . . . have no application to a contract involving interstate commerce"); *Cornwall & Stevens Southeast, Inc. v. Stewart*, 887 F. Supp. 1490, 1491 (M.D. Ala. 1995) (a diversity action holding that, because plaintiffs were engaged in interstate commerce, the Commerce Clause of the United States Constitution precluded application of the "door closing provisions of Alabama law"); *Hughes Associates, Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 858 (N.D. Ala. 1986) ("[A]n exception . . . exists for foreign corporations engaged in interstate commerce even though not qualified to do business in Alabama. Such interstate corporations are welcome to use the courts of Alabama to enforce their contracts.") (citations omitted). In short, when an out-of-state banking institution extends loans to Alabama residents the transaction is interstate commerce. *See In re: Leeds Homes, Inc.* 222 F. Supp. 20, 28-30 (E.D. Tenn. 1963) (holding that loans accepted out of state are interstate commerce), *aff'd on other grounds sub nom. Leeds Homes Inc. v. National Acceptance Company of America*, 332 F.2d 648 (6th Cir. 1964). *See generally* Joyce Yeager,

*Borders and Barriers, Definitions of Authority to do Business as a Foreign Corporation*, 102 Comm. L.J. 398, 418-19 (1997).

## B.  SCD's Failure to Obtain a License From the Alabama Department of Education

Plaintiffs' fall-back argument is that SCD's failure to obtain a license from the Alabama Department of Education renders Key Bank's promissory notes void pursuant to another Alabama statute providing, in part, that:

> (a) No school, except those enumerated in Section 16-46-3, shall operate within this state unless said school first secures a license from the Alabama State Department of Education.
>
> . . .
>
> (m) No recovery against any student shall be had on any contract if such school was not the holder of a license as required by this section at the time that such school or its representative negotiated the contract for or sold such course.

Ala. Code § 16-46-5 (1975) (2001 Replacement Vol.).

Plaintiffs argue that "any student loan contracts, like Key Bank's promissory note, derived from SCD's illegal business practices in Alabama cannot be enforced and are null, void, and unenforceable."[28] In response, defendant asserts that Alabama Code § 16-46-5 "does not govern relationships between lenders and borrowers. Instead, it governs the relationship between private schools and their students."[29] Key Bank is correct. Alabama Code § 16-46-5 is but one of ten statutory provisions enacted during 1980 by the Alabama Legislature, which declared:

> It is hereby generally recognized that courses of instruction, whether given in residence or by mail, result in substantial benefits for students pursuing such courses, provided that such courses are designed and administered in accordance with recognized educational standards and practices. It is also recognized that persons

---

[28] Doc. no. 9 (plaintiffs' brief opposing transfer), at 3-4.

[29] Doc. no. 11 (defendant's reply brief), at 2-3.

> taking such courses and institutions offering such courses should be afforded additional protection under the laws of this state. It is the purpose of this chapter to supplement the general law of fraud of this state so as to provide for students, educational institutions, and the general public such added protection.

Ala. Code § 16-46-2 (1975) (2001 Replacement Vol.). Further, Alabama Code § 16-46-5 applies only to "schools" — defined as "[a]ny person, group of people, institution, establishment, agency, or organization *offering or administering a plan, course, or program of instruction* whether conducted in person, by mail, or by any other method"[30] — and to an "agent or representative" of a school — defined as a "[s]alesperson who presents materials, sells courses, or solicits students for enrollment therefor in this state outside the boundaries of the school facilities."[31] Clearly, Key Bank is neither a "school," nor did it act as an "agent or representative" of SCD by presenting promotional materials, selling courses of instruction, or soliciting students for enrollment "outside the boundaries of the school facilities."

Plaintiffs have cited no authority for the proposition that Key Bank had a duty to confirm that SCD was properly licensed under § 16-46-5(a) to operate an educational facility before extending tuition loans to students within Alabama. Further, plaintiffs have not alleged that defendant and SCD were involved in a relationship such that the statutory bar preventing SCD from recovering on any contract made with plaintiffs should inure to defendant. Plaintiffs merely vaguely speculate that the promissory notes at issue are unenforceable because they are "derived from SCD's illegal business practices in Alabama." Such a premise in not evident from the statute, and is not otherwise supported by law.[32]

---

[30] Ala. Code § 16-46-1(2) (emphasis supplied).

[31] *Id.* § 16-46-1(4).

[32] As a sidenote, this court observes that § 16-46-5(m) begins with the phrase "[n]o recovery against any student shall be had. . . ." Thus, this statute is phrased to provide any student with a complete defense to any action that an unlicenced school might bring against him or her to enforce a contract. In this action, however, plaintiffs attempt to use

Ultimately, however, the defense created by Alabama Code § 16-46-5(m) — like the defense created by the state qualification statute discussed previously — is available in a federal court only when jurisdiction is founded upon the parties' diversity of citizenship, as opposed to, as here, federal question jurisdiction.

**C.      Whether the Forum-Selection Clause Should Be Enforced**

Plaintiffs' final argument is that the forum-selection clause should not be enforced because it is "unfair and unreasonable, and *forum non conveniens* analysis supports class litigation in plaintiffs' chosen forum."[33] The Supreme Court has stated that a plaintiff seeking to avoid enforcement of a forum-selection clause must

> show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain.

*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S. Ct. 1907, 1917, 32 L. Ed. 2d 513 (1972). Additionally, courts have discretion to refuse enforcement of a forum-selection clause where the transfer would "contravene a strong public policy of the forum in which the suit is brought whether declared by statute or by judicial decision." *The Bremen*, 407 U.S. at 15, 92 S. Ct. at 1916.[34] The

---

this statute as a sword, instead of a shield, by bringing suit against the lender extending tuition loans to each of them.

[33] Doc. no. 9 (plaintiffs' brief opposing transfer), at 4 (*nota bene*: the textual quote was taken from plaintiffs' all cap heading numbered "II").

[34] When discussing the *Bremen* test for invalidating contractual, forum-selection clauses in *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998), the Eleventh Circuit observed that other courts have found such provisions to be

> unreasonable under the circumstances, and thus enforceable only when: (1) their formulation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the provisions would contravene a strong public policy.

*Id.* at 1292 (citations and internal quotation marks omitted).

-14-

court thus examines whether plaintiffs have met their burden.

Plaintiffs argue that Key Bank engaged in fraud and overreaching: "The forum selected here by Key Bank has no reasonable relation to the transactions at issue in this case, no relation to where its representatives at SCD and SCD's training facilities are located and, in fact, no relation to where Key Bank's Career Loan management is conducted pursuant to its own documentation."[35] Plaintiffs fail to mention that the forum selected by defendant encompasses its principal office and place of business, located in Cleveland, Cuyahoga County, Ohio.[36] Further, plaintiffs present no evidence of fraud on the part of defendant in presenting the promissory note, much less the forum selection clause contained within it.[37] Given those facts, plaintiffs have not carried their burden of showing that the forum-selection clause should be invalidated due to fraud, overreaching, or bad faith. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S. Ct. 1522, 1528, 113 L. Ed. 2d 622 (1991) (enforcing forum-selection clause contained on the reverse side of cruise ship ticket).

---

[35] *Id.*, at 7.

[36] *See* doc. no. 3 (defendant's motion to dismiss or transfer), Ex. A (Affidavit of Rebecca S. Ruppert) ¶ 4; *see also* doc. no. 4 (original affidavit of Rebecca S. Ruppert) ¶ 4.

[37] In *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974), the Supreme Court clarified one aspect of the *Bremen* test discussed in the immediately preceding marginal note, by holding that a party resisting the application of a forum-selection clause on the basis of fraud must focus upon the inclusion of *the clause itself*, and *not* the contract generally.

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud. . . ." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.

*Scherk*, 417 U.S. at 519 n.14, 94 S. Ct. at 2457 n.14 (emphasis in original) (internal citations omitted). Thus, a party resisting the forum-selection clause in an international agreement is required "specifically to allege that the choice clause itself was included in the contract due to fraud in order to succeed in a claim that the choice clause is unenforceable, [so that] courts may ensure that more general claims of fraud will be litigated *in the chosen forum*, in accordance with the contractual expectations of the parties." *Lipcon*, 148 F.3d at 1296 (emphasis in original). The plaintiffs in the present action have not done that.

Plaintiffs also argue that the forum-selection clause will "deprive plaintiffs and class members of their day in court because of grave inconvenience."[38] Plaintiffs explain that all of the putative class members are from Alabama, and that traveling to Ohio would be financially burdensome and inefficient. In a similar vein, plaintiffs argue that this action should remain in Alabama pursuant to the doctrine of *forum non conveniens*. While this court has little doubt that litigation in Ohio will be more costly and difficult for plaintiffs, the dubious logistical concerns raised in their brief have not been demonstrated to be so insurmountable that, for all practical purposes, plaintiffs will "for all practical purposes be deprived of [their] day in court." *The Bremen*, 407 U.S. at 18, 92 S. Ct. at 1917. Indeed, plaintiffs provide no evidence as to their actual financial condition, but simply speculate that litigation in Pennsylvania may not be within their means.[39] The only "evidence" submitted on the issue is the affidavit of Plaintiff Shannon M. Abel, who states that

> If I am required to sue Key Bank in the State of Ohio, I will not be able to proceed with this case. I am currently living in Trussville, Alabama and would be unable to travel to and from the State of Ohio in order to prosecute this case. In addition, I do not have the financial means to hire a lawyer in the State of Ohio to handle this matter.[40]

This court is not persuaded to disregard the forum-selection clause on the basis of such conclusory assertions. *See Carnival Cruise Lines*, 499 U.S. at 594, 111 S. Ct. at 1527-28 (forum selection clause designating Florida was enforced against Washington plaintiff, because she did not satisfy the heavy burden of proof required to set aside the clause on grounds of inconvenience); *Carron v. Holland America Line-Westours, Inc.*, 51 F. Supp. 2d 322, 326 (E.D.N.Y. 1999) (holding that the

---

[38] Doc. no. 9 (plaintiffs' brief opposing transfer), at 7 (*nota bene*: the textual quote was taken from plaintiffs' bold face heading numbered "(2)").

[39] Affidavit of plaintiff Shannon M. Abel, attached to doc. no. 12 (plaintiffs' surreply), ¶ 10.

[40] *Id.* Interestingly, plaintiffs apparently *can* afford to hire at least one out-of-state attorney to join their stable of Alabama attorneys in the prosecution of this action. Plaintiffs' Motion to Admit *Pro Hac Vice* (doc. no. 8).

fact that the litigant may have to pay a substantial amount for travel to the chosen forum does *not* prevent enforcement of the forum selection clause); *cf. Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 515 (9th Cir. 1988) (holding that an otherwise valid forum selection clause should not be invalidated merely because the alleged wrongful acts were committed, and their harmful effects were suffered, locally).

### III. CONCLUSION

For all of the foregoing reasons, this court is of the opinion that the forum-selection clause contained in the promissory notes executed by each plaintiff should be enforced according to its terms, and that this action should be transferred to the United States District Court for the Northern District of Ohio, Eastern Division. *See* 28 U.S.C. § 115.

DONE this 17th day of March, 2003.

_____
United States District Judge